IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

RAY J. ECKES,

        Plaintiff,

v.                                     Civil Action No. 1:04CV179

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
             Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    Background

    Plaintiff, Ray J. Eckes, (Claimant), filed his Complaint on August 16, 2004 seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed her Answer on October 22, 2004.[2]  Claimant filed his Motion for Summary Judgment and Brief in Support Thereof on November 29, 2004.[3] Commissioner filed her Motion for Summary Judgment and Brief in Support Thereof on December 21, 2004.[4]

B.    The Pleadings

        1.    Claimant's Motion for Summary Judgment.

        2.    Commissioner's Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 4.

[3] Docket No. 7.

[4] Docket No. 9.

C.    Recommendation

1.    I recommend that Claimant's Motion for Summary Judgment be DENIED and that Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision.  Specifically, the ALJ included the limitations supported by the record in the hypothetical posed to the VE.  Also, the ALJ gave proper weight to the medical opinions of record.  In addition, the ALJ properly assessed Claimant's credibility.  Also, the ALJ properly applied the medical vocational guidelines.  Lastly, the ALJ properly considered Claimant's obesity.

## II. Facts

A.    Procedural History

On September 7, 2001 Claimant filed for Disability Insurance Benefits (DIB) alleging disability since October 2, 1998.  The application was denied initially and on reconsideration.  A hearing was held on November 21, 2002 before an ALJ.  The ALJ's decision dated March 20, 2003 denied the claim finding Claimant not disabled within the meaning of the Act.  The Appeals Council denied Claimant's request for review of the ALJ's decision on July 17, 2004.  This action was filed and proceeded as set forth above.

B.    Personal History

Claimant was 49 years old on the date of the November 21, 2002 hearing before the ALJ.  Claimant has a high school education and past relevant work experience as a general construction laborer in the state highway department, craft worker, and transportation worker.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability October 2, 1998 - March 20, 2003:

**Dr. Wiley, M.D., 9/11/00, Tr. 167-174**
IMPRESSION:  Sprain type injury cervical spine.
Cervical disc replacement with radiculopathy, status post-operative C6-C7.
Discectomy and fusion.
Same evaluation 3/24/00, 11/12/99, 7/15/99

**Dr. Hirsch, M.D., 5/24/99, Tr. 191**
- CR cervical spine.
- I cannot identify any sublaxation with flexion or extension.  Degeneration of the C5-C6 disk, findings similar to April 12, 1999.

**Dr. Hogg, M.D., 6/7/99, Tr. 192**
- Encroachment of the right C4-C5 neural foramen secondary to osteophyte formation and focal disc bulge.  This results in impingement on the exiting right C5 nerve root.
- Postoperative changes at C6-C7.

**Health Psychology Evaluation, 7/17/00, Tr. 196**
- Major depression, single episode, mild.
- GAF = 52.

**Dr. Vaglienti, M.D., 2/1/00, Tr. 231**
- Femoral Neuritis.

**Dr. Herland, M.D., 11/18/99, Tr. 236-237**
- There appears to be meralgia paresthetica.

**Dr.  Mitchell, M.D., 2/5/01, Tr. 246**
- Noninsulin Dependent Diabetes, Hgb.

**Dr.  Cotton, M.D., 11/17/00, Tr. 247**
- Bronchitis.

**Dr. Mitchell, M.D., 10/31/00, Tr. 248**
- Noninsulin dependent diabetes under good control.
- Hypertension under good control.

**Dr. Mitchell, M.D., 5/30/00, Tr. 250**
- Noninsulin dependent diabetes.
- Hypertension under good control.
- GERD
- Chronic pain doing well with Oxycontin and Oxycodone.

3

**Dr. Cotton, M.D., 5/5/00, Tr. 251**
- Otitis externa.

**Dr. Mitchell, M.D., 2/29/00, Tr. 252**
- Noninsulin diabetes. New onset.
- Hypertension.
- Elevated liver enzymes.

**Dr. Mitchell, M.D., 12/28/99, Tr. 253**
- One left external auditory canal abscess versus other mass/lesion.

**Dr. Morrell PAC, 12/13/99, Tr. 254**
- One left otitis media otitis externa.

**WVU Surgical Pathology, 12/3/99, Tr. 255**
- Liver, Needle Biopsy:
  - Moderate fatty change, mixed macro- and micro-vesicular type.
  - Mild hemosiderosis.
  - Hepatocytic anisoneucleosis.
  - Hepatocytic nuclear vacuolation.
  - Minimal periportal fibrosis.

**Morrell PAC, 11/29/99, Tr. 257**
- Pneumonia much improved.

**Buckhannon Medical Care, 11/24/99, Tr. 260**
- Cardiopulmonary appearances show no radiopathology, except maybe background of COPD.

**Dr. Mace, M.D., 8/12/99, Tr. 262**
- Right elbow - no radiographic abnormality of bony architecture or alignment.

**Dr. Frick, M.D., 7/21/99, Tr. 263**
- Fluroscopy.
- No evidence for penetration or aspiration.

**Dr. Hirsch, M.D., 2/5/99, Tr. 265**
- At the C2-C3 level, there is no evidence for disk herniation, spinal stenosis, or neural foraminal narrowing.
- At the C3-C4 level, there are minimal hypertrophic changes of the right uncovertebral joint with minimal right-sided neural foraminal narrowing. No spinal stenosis or disk herniation.
- At the C4-C5 level, there are minimal hypertrophic changes of the right uncovertebral joint with minimal neural foraminal narrowing. There is no evidence for spinal stenosis

or disk herniation.
- At the C5-C6 level, there is no evidence for disk herniation, neural foraminal narrowing, or spinal stenosis.
- At the C6-C7 level, there is a severe ventral extradural defect which completely effaces the thecal sac ventrally and causes displacement of the spinal cord posteriorly. Some effacement of the thecal sac posteriorly due to the spinal cord displacement. There are also marked hypertrophic changes of the right uncovertebral joint causing neural foraminal narrowing at this level.
- At the C7-T1 level, there is no evidence for disk herniation, neural foraminal narrowing, or spinal stenosis.

**Dr. Hirsch, M.D., 2/5/99, Tr. 266**
- Large ventral extradural defect at the C6-C7 level. There is also truncation of the right C7 nerve root sleeve.
- Recommend the referring physician see the report of the computed tomography of the cervical spine.
- Performed on conjunction with this myelogram.

**Davis Memorial Hospital, 11/20/98, Tr. 271**
- Evidence of focal posterolateral disc herniation at the C6-7 level.

**Buckhannon Medical Center, 10/27/98, Tr. 273**
- No acute process identified in the chest radioegraphically.

**10/8/98, Tr. 277**
- Degenerative changes and minimal scoliosis.

**Davis Memorial, Abdominal Ultrasound, 5/19/98, Tr. 280**
- Suspect fatty infiltration of the liver. Cholelithiasis.

**Dr. Pearse, Ed.D., 1/21/02, Tr. 313-318**
AXIS I: (309.0) Adjustment disorder, with depressed mood. (307.89) Pain disorder associated with both psychological factors and a general medical condition (by history).
AXIS II: (V71.09) No diagnosis.
AXIS III: Reported neck injury, diabetes, sleep apnea, acid reflux, hypertension, erectile dysfunction, allergies.

**Dr. Sabio, M.D., 1/24/02, Tr. 319-323**
- Degenerative disc disease cervical spine, degenerative arthritis thoracic spine and lumbar spine, restrictive lung disease secondary to morbid obesity and diabetes mellitus Type II, controlled, hypertension, controlled.

**Dr. Jones, M.D., 2/6/02, Tr. 325**
- Significant amount of depression and other psychological problems.

**Psychiatric Review Technique, Kuzniar Ed. D., 2/6/02, Tr. 335-348**
•        Impairments not severe.
•        Affective Disorder (adjustment, history of major depression).
•        Pain Disorder.
•        B Criteria, mild restrictions daily living, difficulties in social functioning and maintaining concentration.
No episodes of decompensation.
Evidence does not establish presence of C Criteria.

**Physical Residual Functional Capacity Assessment**
**Dr. Brown, 3/6/02, Tr. 350-357**
PRIMARY DIAGNOSIS:     Cervical disc disease.
SECONDARY DIAGNOSIS: Cervical discectomy.
EXERTIONAL LIMITATIONS:      Occasionally 20 lbs., frequently 10 lbs., stand or walk 6 of 8 hours, sit 6 of 8 hours, unlimited push and pull.
POSTURAL LIMITATIONS:      All occasionally.
MANIPULATIVE LIMITATIONS: None established.
VISUAL LIMITATIONS:      None established.
COMMUNICATIVE LIMITATIONS: None established.
ENVIRONMENTAL LIMITATIONS: None established.

**Physical Residual Functional Capacity Assessment**
**Dr. Franyutti, M.D., 6/12/02, Tr. 359-366**
PRIMARY DIAGNOSIS:      [illegible] of cervical spine.  Discectomy.
SECONDARY DIAGNOSIS:      Neck and back pain syndrome.
OTHER:      Obesity.
Exertional Limitations: Occasionally 20 lbs., frequently 10 lbs., stand or walk 6 of 8 hours, sit 6 of 8 hours, unlimited push and pull.
POSTURAL LIMITATIONS:      All occasionally.
MANIPULATIVE LIMITATIONS: None established.
VISUAL LIMITATIONS:      None established.
COMMUNICATIVE LIMITATIONS: None established.
Environmental Limitations: Limited, except avoid concentrated exposure to extreme cold, extreme heat and hazards.

**Dr.  Sabo, M.D., 12/28/02, Tr. 387-392**
•        Degenerative disc disease, status post diskectomy of the cervical spine, hypertension, diabetes mellitus and history of erectile dysfunction secondary to the previous operation on the cervical spine.  Degenerative arthritis.

**Dr. Sabo, M.D., 01/02/03**
**Ability to do Work Related Activities Physical, Tr. 393-396**
Exertional Limitations: Occasionally less than 10 lbs., frequently less than 10 lbs., stand or walk

2 of 8 hours, sitting not affected, limited push and pull.
POSTURAL Limitations: Cannot climb, kneel, crouch, crawl, stoop; can occasionally balance.
MANIPULATIVE LIMITATIONS:  Limited reaching, only.
VISUAL LIMITATIONS- COMMUNICATIVE LIMITATIONS:  Unlimited.
ENVIRONMENTAL LIMITATIONS:        Unlimited.

**Dr.  Jones, M.D., 1/22/03, Tr. 398**
•        Cervical disc disease, lumbar strain, right elbow - tendinitis.  Unable to work at any job
         either in sitting or standing or walking positions.

D.        <u>Testimonial Evidence</u>

<u>1. Claimant</u>

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 433-37):

Q        What kinds of problems are you having with your hands?

A        Oh my fingers still get numb.  Still get numb with holding on occasions, and I

have trouble gripping things.  My right arm bothers me.

Q        When you say bothers, what is that?

A        Well I have pain down through it from that golfer's elbow, do they call that, I

don't know the professional term.  But I can't lift anything.  Like sometimes just picking up a

glass of water or something, is enough to cause pain, or just moving it.

Q        Okay.  What symptoms do you have that are the carpal tunnel syndrome

symptoms?

A        Well my hand's drawn up, and - -

Q        When you say draw up, what do you mean?

A        Well it's - -

Q        Can you make your hands flat?

A        Right, no I can't lay it, I can't lay them down like that, straighten them out.

Q       Is that just your right hand, or is it both?

A       Well yeah, it's starting in this.  It's more prominent on my right hand, but my left hand's doing it also now.

*               *               *

Q       And right now, I want to talk about what symptoms you have.  What symptoms do you have as a result of your neck problems?

A       I just, as a cause due to my medicine I just, I can't remember things.  I sleep, I can't, I'm always - - it seems like I'm always sleepy.  I have to have - - okay, I take two or three naps a day.  I have trouble sleeping at night.

Q       So do you have any other symptoms that are related to your neck or your back?

A       Well I can't turn my head, you know, very far around without moving my whole body or looking up.  I have trouble lifting and reaching for things.  Bending over, I can't pick up anything like off of the floor, it's you know.

Q       So you have trouble bending, you have trouble turning?

A       Right, yes.

Q       What about lifting?

A       Yeah, I can't lift anything off the floor, you know, I don't try to pick up anything off the floor, because it just, the motion of bending over hurts my back, I can't.  Five to ten pounds is about all I lift at anytime.

Q       What about the walking?

A       Yeah, I walk with a, I use a cane to walk with now, because I have to have - - the pain in my leg and sometimes it's, it'll get so severe that if I don't have something to support

8

myself with, or get a hold of I'll fall down, which I have done that before.

Q      Okay. When's the last time you fell down?

A      It's been a few months ago, since I actually fell. And I fell going down a set of steps because I didn't have my cane. I was trying to walk, it was in my house walking without my cane and I was going out into my shop. And my leg got a pain in it, and I fell and hit my arm on the - - on a shelf and that's what started it, got it to acting up again.

Q      Okay. You felt because your leg gave away?

A      Right.

Q      And how often, now you haven't fallen in the last month or so because you - -

A      Yeah, I have my cane yeah, I mean but it's - -

Q      How often does your leg give way?

A      Oh, that happens to me two or three times a week, or maybe sometimes more, that you know, it gets so severe that I'll go down if I don't have my cane. Of course I have to have my cane to climb stairs with, you know, that's something that I just, that's another reason because I have to have it doing stairs.

Q      Yeah, how far can you walk?

A      About a quarter of a mile, is about the maximum with, you know.

Q      And then what happens?

A      Then I just have to sit down, I have to take a rest because my back gets to bother me. My back and stuff hurts so bad that I just have to sit down.

## 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr.

457-58):

Q       Okay.  Please assume a younger individual with a high school education.  And precluded from performing all of the following.  Sedentary, sit/stand, no repetitive bending or overhead reaching.  Primarily work entailing gross grasping, as opposed to fine manipulation. Controlled environment, no - - by that I define as no excessive amount of dust, fumes, pollutants. No hazards, defined as dangerous and moving machinery.  Unprotected heights.  Finally unskilled, low stress work, defined as routine and repetitive tasks.  Primarily working with things, rather than people.  Entry level.  So the hypothetical has sedentary work, with a sit/stand option.  And no repetitive bending, or overhead reaching.  Primarily gross grasping, controlled environment, no hazards and low stress. With those limitations are there any jobs this hypothetical individual can perform that you can name?

A       There are a few, Your Honor, at the sedentary level that would comply with those limitations.  Some examples I could give you would be surveillance system monitors.  There are 50 in the local labor market, 15,000 nation.  There are also inspector checkers, 150 local, 37,000 nation.  There are sorters and graders, 100 local, 20,000 nation.

Q       Are those jobs consistent with the DOT?

A       They are, with the exception of the sit/stand option, Your Honor.  There's no mention in the DOT of a sit/stand option.  The reason I offer these in response to your hypothetical, was based on my 23 years experience in placing disabled individuals in jobs.  And these types of jobs typically permit the worker to sit or stand while doing essential duties.

Q       The second hypothetical, if the claimant's combination of medications, depression and pain, impacted his concentration where he could not stay on task one-third to two-thirds of

the workday.  If that is true, are those jobs affected?

A    Yes, that would preclude the individual from performing any of these jobs, Your Honor.  You have to maintain the concentration, persistence and pace, and be on task at least 85 percent of the work shift to sustain unskilled work and competitive work.

Q    Hypothetical three, if the claimant had to lie down two hours every afternoon, is that a tolerable amount of lying down in employment?

A    No, it's not, Your Honor.  You get two 15 minute breaks, and a half hour for lunch.  And you cannot lie down at anytime when you're on the job.

*            *            *

E.    Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

•    Claimant is morbidly obese.  (Tr. 319-23).

•    Able to drive twelve miles.  (Tr. 437).

•    Able to lift five to ten pounds.  (Tr. 435).

•    Able to walk a quarter mile.  (Tr. 436).

•    Able to sit thirty to forty-five minutes.  (Tr. 437).

•    Rides the lawn mower for a half hour.  (Tr. 440).

•    Loads and unloads the dishwasher, dusts, cooks a little.  (Tr. 440-41).

•    Reads magazines.  (Tr. 441).

•    Visits with neighbor, goes to sons' baseball games, attends church.  (Tr. 441, 447).

• Fishes once a week, instructs sons on woodworking. (Tr. 445-48).

## II. The Motions for Summary Judgment

A. <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ failed to include all of Claimant's credible impairments in the hypothetical posed to the VE. Also, Claimant maintains that the ALJ failed to give proper weight to the medical opinions of record. In addition, Claimant asserts that the ALJ failed to properly assess Claimant's credibility. Also, Claimant contends that the ALJ failed to properly apply the medical vocational guidelines. Lastly, Claimant argues that the ALJ failed to consider Claimant's obesity.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ included the limitations supported by the record in the hypothetical posed to the VE. Also, Commissioner asserts that the ALJ gave proper weight to the medical opinions of record. In addition, Commissioner maintains that the ALJ properly assessed Claimant's credibility. Also, Commissioner contends that the ALJ properly applied the medical vocational guidelines. Lastly, Commissioner maintains that the ALJ properly considered Claimant's obesity.

B. <u>The Standards</u>.

1. <u>Summary Judgment</u>. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of

showing the absence of any issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v.  Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

        2.      <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive judicial review.  <u>See</u> 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

        3.      <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

        4.      <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

        5.      <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

        6.      <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to

determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. <u>Hayes v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7. <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8. <u>Social Security - Substantial Evidence - Defined</u>. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9. <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

14

10. <u>Social Security - Hypothetical Question</u>. The ALJ is afforded "great latitude in posing hypothetical questions," <u>Koonce v. Apfel</u>, No. 98-1144, 1999 WL 7864, at *5 (4th Cir. Jan.11, 1999)[5], and need only pose those that are based on substantial evidence and accurately reflect the plaintiff's limitations. <u>Copeland v. Bowen</u>, 861 F.2d 536, 540-41 (9th Cir. 1988).

11. <u>Social Security - Treating Physician - Controlling Weight</u> - The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). <u>See also</u> <u>Evans v. Heckler</u>, 734 F.2d 1012 (4th Cir. 1984); <u>Heckler v. Campbell</u>, 461 U.S. 458, 461 (1983); <u>Throckmorton v.  U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir.  1990).

12. <u>Social Security - Ultimate Issue</u>. Whether an individual is disabled or able to work is an issue reserved for the Commissioner. SSR 96-5p.  Opinions as to disability or ability to work given by a treating source can "never be entitled to controlling weight or given special significance." <u>Id</u>. <u>Id.</u> at 592 (citing <u>Gross v. Heckler</u>, 785 F.2d 1163, 1166 (4th Cir. 1986)).

13. <u>Social Security - Claimant's Credibility - Pain Analysis</u>.  The determination of whether a person is disabled by pain or other symptoms is a two step process.  First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged.  Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of

---

[5] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

pain in light of the entire record.  Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

C.      Discussion

## 1. Hypothetical

Claimant maintains that the ALJ failed to include all of Claimant's credible impairments in the hypothetical posed to the VE.  Commissioner counters that the ALJ included all the limitations supported by the record in the hypothetical posed to the VE.

The ALJ is afforded "great latitude in posing hypothetical questions," Koonce v. Apfel, No. 98-1144, 1999 WL 7864, at *5 (4th Cir. Jan.11, 1999)[6], and need only pose those that are based on substantial evidence and accurately reflect the plaintiff's limitations.  Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988).

Claimant's testimony that he needs to rest every day and has problems staying awake is subjective.  As is discussed below the ALJ properly found that "claimant's allegations regarding his limitations are not totally credible".  (Tr. 32).  Accordingly, Claimant's subjective allegations are not supported by the record.  Therefore, the ALJ properly included the limitations supported by the record in the hypothetical posed to the VE.

## 2. Examining and Treating Physicians

Claimant maintains that the ALJ erred in failed to give great weight, if not controlling weight, to Claimant's treating physicians, Dr. Jones and to Dr. Wiley.  Commissioner counters that the ALJ properly determined that the opinions of Dr. Wiley and Dr. Jones were not entitled to controlling

---

[6] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

weight.

Dr. Jones opined that Claimant was disabled. (Tr. 327, 332-33, 398). Dr. Wiley opined that Claimant was temporarily totally disabled and subsequently opined that Claimant had a 25% whole body permanent physical impairment and loss of physical function to the whole body. (Tr. 173). Whether an individual is disabled or able to work is an issue reserved for the Commissioner. SSR 96-5p. Opinions as to disability or ability to work given by a treating source can "never be entitled to controlling weight or given special significance." Id. Therefore, the ALJ properly denied controlling weight to Dr. Jones' and Dr. Wiley's opinions that claimant was disabled.

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). See also Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984); Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

Dr. Jones' opinion did not cite any medically acceptable clinical and laboratory diagnostic techniques. Therefore, the first prong is not met. Dr. Wiley's treatment notes were largely based upon Claimant's subjective reports of pain. (Tr. 29). As is discussed below the ALJ properly determined that Claimant was not totally credible. The X-ray reports taken by Dr. Wiley consistently showed only minimal degenerative changes in his back; no subluxations and a solid cervical fusion of C6-C7 (tr. 171-72). The X-rays noted by Dr. Wiley do not support Dr. Wiley's claim that Claimant was temporarily totally disabled and subsequently 25% disabled.

Dr. Jones' and Dr. Wiley's opinions are also inconsistent with other substantial evidence in the case record. "Dr. Jones wrote in January 2001 that the claimant had not recovered from neck

surgery [Tr. 325-34]. To the contrary , the claimant was reporting no recent pain symptoms related to his neck or cervical spine in December 2000 and related May 2000 cervical imaging was essentially unremarkable [Tr. 200-41]." (Tr. 29). In November 1999, Dr. Wiley noted improvement in Claimant's condition. (Tr. 181). In March 2000, Dr. Wiley noted that Claimant walked normally and had full range of motion in his shoulders, elbows, hands and wrists. (Tr. 178). In September 2000, Dr. Wiley noted that Claimant had a normal stance, a mild antalgic gain, did not use a cane, and had only mild tenderness in his back. (Tr. 171). In March and May 1999, imaging reports showed no malalignment, no fractures and only minimal degenerations. (Tr. 189, 191). In March 2002 and June 2002 Drs. Brown and Franyutti, two state agency physicians, concluded that Claimant could perform light work with restrictions. (Tr. 359-67). Therefore, the ALJ gave proper weight to Dr. Jones' and Dr. Wiley's opinions.

### 3. Credibility

Claimant asserts that the ALJ failed to properly assess Claimant's complaints of pain. Commissioner counters that the ALJ properly assessed Claimant's subjective complaints of pain.

The determination of whether a person is disabled by pain or other symptoms is a two step process. First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

The ALJ determined that Claimant "has medically determinable impairments that could reasonably be expected to cause some of the symptoms described." (Tr. 25). That satisfies the first

prong of Craig. The ALJ then considered the credibility of Claimant's subjective complaints of pain in light of the entire record. The ALJ noted that the Claimant "indicated to a psychologist that he consciously limits his activities so as not to diminish his prospects to obtain disability benefits." (Tr. 25, 384). Claimant acknowledged automobile trips to Virginia Beach. Claimant testified that he could walk up to one-fourth of a mile with a cane, and that he continued to ride his motorcycle short distances until 2000. He volunteered as a fireman working the radio, Claimant drives alone two to three miles per day and up to twelve miles if accompanied. He enjoys woodworking, Claimant assists with household chores including dusting, loading and unloading the dishwasher, and riding a lawn mower. Claimant visits friends, attends church, reads magazines and instructs his friends' sons in wood shop. Claimant hunts twice a year, goes fishing and attends baseball games. (196, 384, 435-37, 440-41, 445-51).

Also, the ALJ noted that "[t]he record indicates that the claimant has inconsistently described his second work-related injury, reportedly incurred on October 2, 1998 while lifting either an oak desk or other 'heavy objects' up a flight of stairs. One wonders initially why the claimant would attempt to lift a heavy oak desk up a stairway after having being off of work within the previous year for allegedly significant back and shoulder problems for which he received workers' compensation. It is observed that the claimant was able to complete his schedules shift on the day of his alleged injury and that he did not seek any medical treatment until the following day (Exhibit 1F/19). On October 3, 1998, he told family physician Dr. William C. Mitchell that he had felt a "pull in his back" the previous day while lifting a desk at work. The only diagnosis listed was thoracic strain and the claimant was told not to work for three days (Exhibit 4F/38). On October 7, 1998, Dr. Mitchell noted that the claimant was already on workers' compensation at that time and his follow-up assessment

noted thoracic/cervical strain (Exhibit 4F/37). Imaging study of October 8, 1998 indicated minimal cervical and thoracic degenerative changes and minimal scoliosis but no fracture (Exhibit 4F/34). The claimant did not return to work from October 19-23, 1998 (Exhibit 1F/11). On October 26, 1998, the claimant returned to Dr. Mitchell complaining of thoracic pain, more on the right [side] than the left. He requested to be referred to a specialist. Dr. Mitchell made such a referral and also prescribed narcotic pain medication for the claimant (Exhibit 47/33). Chest imaging of October 27, 1998 revealed only mild degenerative thoracic spine changes (Exhibit 4F/32). Having initially described his alleged October 2, 1998 injury only as a 'pull in his back', it is noted that the claimant on July 20, 1999 characterized that injury as a 'sudden onset of back pain with radiation into the right shoulder' (Exhibit 1F/19). On November 18, 1999, the claimant reported a chief complaint of 'pain in the anterior aspect of his thigh' that had started on October 2, 1998 when he was carrying some 'heavy objects' on some stairs (Exhibit 3F/37). The claimant had reported no thigh pain in conjunction with his alleged October 2, 1998 neck or back injury to Dr. Mitchell at multiple visits in October 1998. On July 17, 2000, the claimant again described his October 2, 1998 injury as a 'sudden onset of neck pain' without reporting radicular symptoms (Exhibit 2F/3). On September 11, 2000, the claimant referenced a lumbar spine sprain of June 9, 2997 resulting in an earlier compensation claim and then asserted that his more recent injury of October 2, 1998 had caused 'recurrence' of low back and leg pain from that earlier injury and that his low back bothered him more than his neck (Exhibit 1F/6). It also appears that the claimant, through his physician Dr. Eric T. Jones, subsequently attributed alleged urological problems and sexual dysfunction to his 'compensable neck injury [of October 2, 1998], mediation or related treatment' (Exhibit 8F/6). In conjunction with his disability application of November 2001, the Claimant wrote that he stopped

working on October 2, 1998 because of a 'back injury at work' (Exhibit 2E/2). On January 24, 2002, the claimant, apparently for the first time, described having heard a 'popping noise' in his neck while lifting a desk up some stairs on October 2, 1998 and stated that he had experienced neck pain that radiated to the left leg (Exhibit 7F/1)." (Tr. 19-20). "Claimant has relied significantly upon prescribed narcotic medications for at least three years and has frequently asserted that they are helpful . . . . The claimant has demonstrated no inclination or desire to return to the work force since October 1998, after incurring a neck sprain or pulled back that was initially anticipated by his physician as likely to result in three days of missed work. Although a cervical discectomy was ultimately performing in February 1999, initial imaging studies of the claimant's cervical spine and thoracic spine in October 1998 were unremarkable (Exhibit 4F/37)." (Tr. 25). The ALJ throughly considered Claimant's credibility of his subjective allegations of pain in light of the entire record in accordance with the second prong of <u>Craig</u>. Therefore, the ALJ properly assessed Claimant's credibility of his subjective complaints of pain.

Claimant argues that the ALJ based his conclusion that Claimant was not credible on impermissible factors such as his workers compensation benefits and that he has a disabled brother. Claimant's argument in misplaced. The ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. <u>Craig v. Chater</u>, 76 F.3d 585 (4th Cir. 1996). As discussed above the ALJ appropriately determined Claimant's credibility based on his subjective allegations of pain in light of the entire record.

<u>4. Medical Vocational Guidelines</u>

Claimant argues that the ALJ should have applied the guidelines to the Claimant in a flexible manner and assessed him in the person closely approaching advanced age group. Commissioner

counters that the ALJ properly used the medical vocational guidelines as a framework for the decision.

Claimant alleges that he became disabled on October 2, 1998 when he was 45 years old. At the time of the ALJ's decision the Claimant was 6 months away from his 50th birthday. A younger person for the purposes of the medical vocational guidelines is under the age of 50. For the purposes of the decision the ALJ evaluated the Claimant from the time he allegedly became disabled until the date of the decision. During the period of adjudication Claimant was 45 to 49 years old. The ALJ properly applied the younger person age group for Claimant.

### 5. Obesity

Claimant alleges that the ALJ erred when he failed to consider Claimant's obesity in his functional limitations. Commissioner counters that the ALJ properly considered Claimant's obesity. Claimant's argument is without merit. The ALJ found that Claimant suffers from restrictive lung disease secondary to morbid obesity. (Tr. 17). Claimant does not note or explain any obesity related restrictions that the ALJ did not account for. The ALJ considered all of Claimant's impairments in determining Claimant's RFC. Therefore the ALJ did properly considered Claimant's obesity.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment be DENIED and that Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ included the limitations supported by the record in the hypothetical posed to the VE. Also, the ALJ gave proper weight to the medical opinions of record. In addition, the ALJ properly assessed Claimant's credibility. Also, the ALJ properly applied the medical vocational guidelines. Lastly, the ALJ properly considered Claimant's

obesity.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.   A copy of such objections should be submitted to the District Court Judge of Record.   Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to parties who appear *pro se* and any counsel of record, as applicable.

DATED: June 14, 2005


/s/ James E. Seibert

JAMES E.  SEIBERT
UNITED STATES MAGISTRATE JUDGE